**Opinion issued April 9, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-22-00623-CV**

————————————

**TOTAL DISTRIBUTION SERVICES, LLC, Appellant**

**V.**

**RSS RECOVERY SOLUTIONS, LLC AND FLASH FUNDING, LLC,**
**Appellees**

---

**On Appeal from the County Civil Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 1155797**

---

**MEMORANDUM OPINION**

In this business dispute, Total Distribution Services, LLC ("TDS") appeals

the trial court's take-nothing judgment, entered after a jury trial, on its claims for

business disparagement and tortious interference with existing contracts and

prospective business relations against Flash Funding, LLC ("Flash").[1] TDS contends that it established each element of its claims and the jury's contrary findings are against the great weight and preponderance of the evidence. Because we conclude legally and factually sufficient evidence supports the jury's findings, we affirm.

**Background**

Luis Pineda founded TDS—a freight-brokerage company—in 2018 to serve as an intermediary between shippers and motor carriers. When he founded TDS, Pineda had worked in the trucking industry for several years but not as a broker. Through Pineda's industry experience and connections, TDS became one of only six brokers used by pipe manufacturer Tenaris to ship its product. According to Pineda, Tenaris was selective in choosing its brokers and renegotiated contract terms with TDS every four months. Almost all of TDS's business came from Tenaris.

The carriers that TDS hired for Tenaris shipments invoiced TDS. Then, TDS invoiced Tenaris. Carriers wanting to expedite payment and avoid invoice-processing delays could ask TDS to "quick pay" for a three to five percent reduction of the invoiced amount. Or they could sell their invoice to a third-party factoring company. Factoring companies, like Flash here, buy invoices at a discount

---

[1]     The trial court's final judgment also ordered that TDS take nothing on its claims against another company affiliated with Flash—RSS Recovery Solutions, LLC— because those claims were abandoned by TDS and not submitted to the jury. TDS does not appeal that part of the judgment, so RSS is not before us in this appeal.

and then present the invoices to the broker with a notice of assignment instructing the broker to pay the factoring company instead of the carrier. According to Pineda, about 60 to 70 percent of TDS's carriers worked with factoring companies. TDS knew Flash held assignments from some of its carriers and was owed payment on those invoices.

In 2020, after two years of operation, TDS experienced cash-flow issues. Pineda blamed slow payments from Tenaris and theft of around $40,000 by two unnamed individuals. TDS bounced checks and, in February 2020, forfeited its corporate charter.[2] By March 2020, TDS owed money to "a lot of people," including some carriers and Flash.

On March 25, Henry Perez from Flash emailed Pineda to complain that TDS was not paying Flash and instead was quick paying carriers, including some that had sold their invoices to Flash. TDS owed Flash about $29,000 on past-due invoices. Perez wrote:

---

[2] Pineda said that he later made a payment to the Texas Secretary of State to reinstate the charter.

I have had it.

Luis,

You are one character. You have no money to pay us as we continue to extend credit to you and wait way well past our agreed terms, but you sure have the money to pay carriers when they request QP. I told you not to pay carriers directly but you seem to operate by your own rules.

You are about to learn a very expensive lesson.

Good luck!

Flash hired an attorney and demanded payment from TDS and Tenaris. On March 30, Flash's attorney emailed Michael Taft at Tenaris. The email accused TDS of doing "some really bad stuff" and "a lot of illegal things." It alleged that TDS was "intentionally withholding money owed to factoring companies for cash flow" so that it could quick pay other carriers and collect the quick pay fee. In Flash's view, this meant TDS was "profiting at the expense of the banks and factoring companies." The email warned that Flash's bank wanted "to proceed with collections against Tenaris and all the shippers" but Flash had held the bank off for a few days. The email concluded with a plea for Tenaris to help TDS meet its obligations:

> Anything you can do to help TDS to come current by Friday and to straighten up going forward will help. Flash has an end of month report to their bank coming up that needs to be clean for TDS; otherwise I don't think Flash will be able to buy Tenaris any more time.

The same day he received the email, Taft contacted Delia Espinoza in Tenaris's accounts payable department and asked for "any help" she could give TDS. Espinoza responded:

The specific case of payments to TDS has been delayed because we haven't received the correct backup to process their invoices, we had informed the vendor and the collections office about this each time they sent us an [sic] statement, if you have the list of invoices, Yair [another Tenaris employee] can share with them again the things that are missing in order to pay.

Pineda acknowledged that Tenaris had told TDS before the March 30 email from Flash's attorney that it could not pay TDS because TDS was not correctly submitting invoices. Some rejected invoices were more than 200 days old. Asked whether TDS's accounting "was a mess," Pineda said, "Yes." TDS worked with Tenaris to resubmit invoices. But, according to Pineda, TDS's income-flow from Tenaris fell to zero after the email from Flash's attorney. By mid-April 2020, TDS was no longer receiving any business from Tenaris. Pineda estimated that this resulted in losses of more than $229,000.

Flash later sued TDS and Tenaris through its collections affiliate. After the suit was filed, Tenaris paid the amounts due. But TDS counterclaimed against Flash for business disparagement, tortious interference with an existing contract, and tortious interference with prospective business relations. TDS alleged that Flash had disparaged TDS's business when Flash's attorney emailed Tenaris and accused TDS of breaking the law. Flash's accusations, TDS asserted, had also tortiously interfered with TDS's existing and prospective relationship with Tenaris. Flash answered and pleaded justification as an affirmative defense, asserting that it exercised its own collections rights in good faith when its attorney emailed Tenaris.

5

TDS and Flash agreed to realign the parties, making TDS the plaintiff and Flash the defendant. After a trial, the trial court submitted TDS's three claims and Flash's affirmative defense to the jury. The trial court's charge instructed the jury to consider only certain statements from Flash's attorney's email to Tenaris in deciding whether Flash had disparaged TDS's business. Specifically, the statements that:

- "TDS is doing some really bad stuff here."

- "TDS is doing a lot of illegal things."

- "TDS is intentionally slow paying factoring companies so that TDS can use money owed to factoring companies to pay motor carriers quickly."

- "Everyone knows why TDS is doing this – they are charging motor carriers a fee to pay them quickly."

- "So TDS is intentionally withholding money owed to factoring companies for cash flow so that TDS can pay other carriers in a few days for the purpose of collection a quick pay fee (a factoring fee)."

- "The factoring companies and their banks are financing TDS'[s] quick pay program, and TDS is profiting at the expense of the banks and factoring companies."

The jury rejected each of TDS's claims, finding that Flash had not disparaged TDS's business or interfered with TDS's existing contract or prospective relations with Tenaris. The jury also found that Flash had "a good faith belief that it was exercising a right to collect the past due account receivables from TDS and/or Tenaris."

The trial court entered a take-nothing judgment in accordance with the jury's verdict, and TDS appealed.

6

**Sufficiency of the Evidence**

In its third, fourth, and fifth issues, TDS challenges the legal and factual sufficiency of the evidence to support the jury's findings that Flash did not disparage TDS's business or interfere with TDS's existing contract or prospective business relations with Tenaris. We address these issues collectively, considering the causation element of each claim.

## A. Standard of review

When a party attacks the legal sufficiency of an adverse finding on which it has the burden of proof, the party "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). We consider all the evidence in the light most favorable to the verdict, and we indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). In determining whether legally sufficient evidence supports the finding under review, we consider evidence favorable to the finding, if a reasonable factfinder could consider it, and disregard evidence contrary to the finding, unless a reasonable factfinder could not disregard it. *Id.* at 827.

When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, the party "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence."

7

*Francis*, 46 S.W.3d at 242. In reviewing a factual sufficiency challenge, we consider all the evidence and set aside a verdict only if the evidence is so weak that the finding is clearly wrong and unjust. *Id.*

The jury is the sole judge of the credibility of the witnesses and the weight of their testimony. *City of Keller*, 168 S.W.3d at 819. The jury may believe one witness and disbelieve another as it resolves inconsistencies in the testimony. *Id.* at 819–20.

## B. Causation

TDS sued for business disparagement and interference with current and prospective contractual or business relations. Causation is an element of each cause of action. *See In re Lipsky*, 460 S.W.3d 579, 592 (Tex. 2015) (orig. proceeding) (to prevail on claim for business disparagement, plaintiff must show defendant's actions resulted in special damages to plaintiff); *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (to prevail on claim for tortious interference with prospective business relations, plaintiff must show defendant's interference proximately caused plaintiff's injury); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (to prevail on claim for tortious interference with existing contract, plaintiff must show defendant's interference proximately caused plaintiff's injury).

TDS's causal theory was that Tenaris stopped sending TDS business because Flash's attorney accused TDS of doing "bad" or "illegal things," including quick paying carriers to increase its cash flow while failing to pay factoring companies.

8

According to TDS, the conclusive or overwhelming evidence that these accusations influenced Tenaris's decision to stop working with TDS is the timing—Flash's attorney emailed Tenaris at the end of March 2020 and then Tenaris stopped giving TDS work in mid-April 2020. While this timing may be some evidence of a causal link between Flash's accusations and the loss of Tenaris's business, the jury did not have to credit it over evidence that TDS's losses had other causes. *City of Keller*, 168 S.W.3d at 819 (jury is sole judge of weight and credibility of evidence).

For instance, Flash elicited testimony that, the day after its attorney emailed Tenaris, Tenaris started a new contract term with TDS. The email resulted in immediate efforts by Tenaris to get TDS paid, not terminated. Pineda admitted that TDS was in financial distress before Flash's attorney emailed Tenaris. TDS was not paying carriers and factoring companies for Tenaris shipments. Flash also presented evidence that TDS's poor accounting practices prevented it from keeping up with the paperwork requirements to get paid by Tenaris. Tenaris rejected hundreds of TDS invoices because they were not submitted with proper documentation, were for loads not assigned to TDS, or had already been paid. From this evidence and Pineda's own testimony that Tenaris was selective about brokers, implying its standards were high, the jury could reasonably infer that TDS lost business because of its own failures.

Considering the conflicting evidence, a reasonable jury could have disregarded TDS's theory for why Tenaris stopped doing business with TDS and accepted Flash's theory that TDS's own business practices caused its business loss. TDS thus did not conclusively establish its business disparagement or tortious interference claims as a matter of law, and we hold the jury's findings are supported by legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 827; *Francis*, 46 S.W.3d at 241. Likewise, the evidence supporting the jury's findings is not weak enough to make the findings clearly wrong or unjust. *See Francis*, 46 S.W.3d at 242. Because TDS did not show that the jury's findings of no business disparagement or tortious interference are against the great weight and preponderance of the evidence, we hold the jury's findings are factually sufficient. *See id.*

We overrule TDS's third, fourth, and fifth issues. Because our disposition of these issues resolves each liability theory, we need not reach TDS's first or second issues addressing other elements of its claims or Flash's affirmative defense. *See* TEX. R. APP. P. 47.1.

**Conclusion**

We affirm the trial court's judgment.


Sarah Beth Landau
Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

10